# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**MONTREAL CLARK,**

**Plaintiff,**

**v.**                                            **Case No. 25-CV-329**

**SARAH PAUER,**

**Defendant.**

## DECISION AND ORDER

### 1. Background

On March 16, 2023, a little after 10:00 PM, Oshkosh Police Officer Jonathan Graminske was assigned to a call at a senior living facility. (ECF No. 26, ¶ 6.) An employee there, Sarah Jolly, reported that an ex-boyfriend was threatening her. (ECF No. 26, ¶ 6.) Jolly did not want officers to respond in a marked squad car because she was afraid that her ex-boyfriend was watching the facility and would "do something" to her or the facility if he saw police. (ECF No. 26, ¶ 8.) Therefore, Graminske called Jolly. (ECF No. 26, ¶ 9.)

Jolly told Graminske that the day before she met a man in Milwaukee who had recently been released from prison for sex trafficking. (ECF No. 26, ¶¶ 11, 12.) She knew this man only as Keshawn, but officers subsequently identified him as Montreal Clark. (ECF No. 26, ¶ 10.) Jolly and Clark had spent the prior day in Clark's car as

he drove around Milwaukee. In the afternoon, Clark was involved in a high-speed chase with police while Jolly was a passenger. (ECF No. 26, ¶ 14.) Despite her pleas, Clark refused to let her out of the car, instead slapping her and telling her to remain silent. (ECF No. 26, ¶ 15.)

Having evaded the police, Clark drove to Jolly's home and Clark took Jolly's Buick Rendezvous. (ECF No. 26, ¶ 17.) They spent the night in a Walmart parking lot before going to Jolly's workplace the following morning to get her paycheck. (ECF No. 26, ¶¶ 17-18.) Clark forced Jolly to cash her paycheck and then he took the cash. (ECF No. 26, ¶¶ 20-21.) Clark dropped Jolly at work around 2:00 PM, retained possession of Jolly's car, and said he would go to bars but return when she ended work at 3:00 AM. (ECF No. 26, ¶¶ 23-24.)

Jolly told Graminske that she wanted to report that Clark stole her car and her paycheck, and she said that Clark may be at a bar on Main Street. (ECF No. 26, ¶ 27.)

Graminske discussed the matter with his supervisors, Sergeant Sarah Pauer and Lieutenant Matthew Ziegler. (ECF No. 26, ¶ 29.) They decided to try to locate Jolly's Rendezvous and then wait for Clark to return to it. (ECF No. 26, ¶ 29.) They eventually found Jolly's unoccupied car in a parking lot, parked between two other cars, near where Jolly said Clark may be. (ECF No. 26, ¶ 31.)

Graminske and Pauer watched the car until about 1:28 AM when they saw a person who fit Jolly's description of Clark approach the car. (ECF No. 26, ¶ 32.) Clark

got in the car, and Graminske parked his marked squad car behind it. (ECF No. 26, ¶ ¶ 34-35.) Pauer parked her squad behind Graminske's. The following events were recorded on bodycams worn by Graminske and Pauer.

Graminske, wearing his full uniform and using his flashlight to light up the windows, walked up to the driver's side of the car. (ECF No. 26, ¶ 37.) At the same time Pauer approached the passenger side, also using her flashlight to illuminate the interior of the car. (ECF No. 26, ¶¶ 44-46.) It was nighttime, but the parking lot was illuminated as would be expected for a parking lot in a commercial district. There were water droplets on the car and the windows as if it had recently rained.

Pauer reached the car first and knocked on the front passenger window. (ECF No. 26, ¶ 46.) As she was doing so, Clark started the car. (ECF No. 26, ¶ 38.) Graminske approached on the driver's side and likewise knocked loudly and rapidly on the driver's side window. (ECF No. 26, ¶ 39.)

Clark shifted into reverse, backed up about halfway out of the parking spot, and struck Graminske's squad car. (ECF No. 26, ¶ 40.) Graminske drew his handgun and retreated behind the cover of an adjacent parked vehicle. (ECF No. 26, ¶¶ 41-42.) Pauer, who was now in front of the car, saw Clark shift the car and heard the engine rev loudly. (ECF No. 26, ¶¶ 51, 57.) Pauer drew her handgun, the engine revved again before starting to move forward, and she fired twice, striking Clark once in the face. Pauer moved to the side, the car continued forward striking the concrete base of a streetlamp, and the engine continued to rev with smoke coming from the front tires

or underside of the engine compartment before the engine stopped racing. From the time Clark started the car to when Pauer fired the second shot about nine seconds elapsed. It was only about three seconds from the time Clark hit the squad car until Pauer's first shot.

Clark insists he never saw the officers or saw the squad car he hit. (ECF No. 32, ¶¶ 6, 9, 12, 15, 18.) Notably, neither squad had its emergency lights on although the headlights of at least Graminske's squad car were on and directed at Clark's car. Nor did the officers verbally identify themselves or offer any verbal commands or statements except for Pauer having shouted immediately before she fired. (ECF No. 32.) Although Clark denied hearing "any commands or other statements from police officers" (ECF No. 32, ¶¶ 7, 10, 13, 16, 19), he does not explicitly deny having heard them knocking on his windows. Pauer, however, states that Clark turned and looked directly at her after he started the car (ECF No. 26, ¶ 47), and she believed she made eye contact with him as he shifted the car after he struck the squad (ECF No. 26, ¶ 50). Pauer's bodycam appears to have captured Clark looking at her before he backed into Graminske's squad car. (ECF No. 32 at 3.) As explained below, these factual disputes prove inconsequential to the present motion, where the court views the evidence in the light most favorable to the non-movant.

Clark brought this action against Pauer alleging that she violated the Fourth and Fourteenth Amendments. (ECF No. 1.) Pauer seeks summary judgment. (ECF No. 15.) Briefing on that motion is complete. The court has jurisdiction under 28 U.S.C. § 1331.

## 2. Summary Judgment Standard

"A motion for summary judgment is a contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender Ltd. Liab. Co. v. Nat'l Ret. Fund.*, 778 F.3d 593, 601 (7th Cir. 2015). The court does not "weigh the evidence and determine the truth of the matter" but rather "determine[s] whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The movant has the burden to show that summary judgment is appropriate. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). The court will "read the facts and draw all reasonable inferences in the light most favorable to the non-moving party." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 945 (7th Cir. 2024). Nonetheless, the non-movant must go beyond mere allegations and conclusions and instead support its contentions with proper documentary evidence. *Foster v. PNC Bank*, 52 F.4th 315, 320 (7th Cir. 2022); *Weaver*, 3 F.4th at 934. Speculation is insufficient to create a genuine dispute of material fact. *Id.* If the movant sustains its burden and shows both that there are no disputed material facts and that it is entitled to judgment as a matter of law "[t]he court shall grant summary judgment …." Fed. R. Civ. P. 56(a).

## 3. Qualified Immunity

"Qualified immunity shields a government official from suit for damages under § 1983 'when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.'" *Sabo v.*

*Erickson*, 128 F.4th 836, 843 (7th Cir. 2025) (en banc) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *Taylor v. Riojas*, 592 U.S. 7, 8 (2020)).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982). "[Q]ualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)). "To overcome a qualified immunity defense, plaintiffs must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Sabo*, 128 F.4th at 843 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

As to the first prong, police officers are permitted to use force, including deadly force, provided it is objectively reasonable to do so. *See Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018); *see also Tennessee v. Garner*, 471 U.S. 1, 9 (1985). Reasonableness is assessed under the totality of the circumstances and from the perspective of a reasonable police officer at the time the force was employed. *See Smith v. Finkley*, 10 F.4th 725, 736 (7th Cir. 2021). Relevant circumstances include "the level of duress involved; and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances." *Id.* (quoting of

*Siler v. City of Kenosha*, 957 F.3d 751, 759 (7th Cir. 2020)) (internal quotation marks omitted). Thus, courts must be careful to consider reasonableness from the perspective of an officer in the moment and resist the temptation to dissect the encounter with the aid of hindsight. *Tousis v. Billiot*, 84 F.4th 692, 698 (7th Cir. 2023) (quoting *Tolliver v. City of Chi.*, 820 F.3d 237, 245 (7th Cir. 2016)); *see also Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").

As to the second prong of the qualified immunity analysis, "[a] constitutional or statutory right is 'clearly established' when the law is 'sufficiently clear that every reasonable official would understand that what he is doing is unlawful.'" *Sabo*, 128 F.4th at 843-44 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks omitted)). "In the context of excessive force claims, a plaintiff can meet 'this burden either by identifying a closely analogous case that established a right to be free from the type of force the police officers used on him or by showing that the force was so plainly excessive that, as an objective matter, the police officers would have been on notice that they were violating the Fourth Amendment.'" *Manery v. Lee*, 124 F.4th 1073, 1080 (7th Cir. 2025) (quoting *Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (internal quotation marks omitted)).

Plaintiffs are not required to identify a case that is "directly on point" to overcome qualified immunity but rather must point to "settled authority" that has placed the "constitutional question beyond debate." *Manery*, 124 F.4th at 1080

(quoting *al-Kidd*, 563 U.S. at 741). In identifying the clearly established constitutional principle, courts must be careful not to "define[] the constitutional right at too high a level of generality." *Id.* "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Zorn v. Linton*, 146 S. Ct. 926, ___, 2026 U.S. LEXIS 1471, *4 (2026) (per curiam) (quoting *Wesby*, 583 U.S. at 63). This is particularly important in the context of excessive force. General principles such as "an officer may not use unreasonable and excessive force," *id.* (quoting *Kisela v. Hughes*, 584 U. S. 100, 105 (2018) (per curiam)) or "deadly force cannot be used when there is no longer an imminent threat of danger" are insufficient because they often do not meaningfully inform police officers of how to respond to the broad variety of situations they confront. *See Manery*, 124 F.4th at 1080.

The court has discretion to address only the second prong of the qualified immunity analysis. *Tousis*, 84 F.4th at 697; *see also Manery*, 124 F.4th at 1080. When the constitutional question is fact-intensive, as is often true in excessive force claims, *see Gupta v. Melloh*, 19 F.4th 990, 996 (7th Cir. 2021), it is often practical to address only the second prong. *See Chaklos v. Stevens*, 560 F.3d 705, 711 (7th Cir. 2009) (quoting *Pearson*, 555 U.S. at 237). Because the second prong is dispositive, the court addresses only whether Pauer's actions, viewed in the light most favorable to Clark, violated clearly established federal law. *See Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019).

In an effort to show that it was clearly established that Pauer's use of force violated the Fourth Amendment, Clark argues that what might be called the officer-created danger exception to qualified immunity applies. (ECF No. 27 at 6.) In *Estate of Starks v. Enyart*, 5 F.3d 230, 232 (7th Cir. 1993), police officers shot and killed a driver. The plaintiffs there conceded that if the driver drove toward the officer, the officers were entitled to qualified immunity. *Id.* at 233-34. However, a factual dispute existed over whether the officer had unreasonably created the circumstances for using deadly force by stepping into the path of the car after it was already driving away. It held, "Police officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force." *Id.* at 234.

The court was cautious to emphasize that this did not mean that an officer forfeits the privilege to use force simply because his actions put him in danger. *Starks*, 5 F.3d at 233. Police officers are expected to put themselves in danger, yet they retain the privilege to defend against the dangers they face. Only if the officer's actions were "so far outside the bounds of reasonable behavior that the deadly force was almost entirely a result of the officers' actions" will qualified immunity be inapplicable. *Pam v. City of Evansville*, 154 F.4th 523, 534 (7th Cir. 2025) (quoting *Biegert*, 968 F.3d at 698); *see also Estate of Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008) ("Where a police officer unreasonably places himself in harm's way, his use of deadly force may be deemed excessive.").

The principle recognized in *Starks* does not apply here. Pauer's bodycam shows that she found herself in front of Clark's car before he attempted to or actually moved forward. She was backtracking by the time she fired. There may be room to debate whether it was tactically wise for a police officer to step in front of a vehicle under the circumstances (or for the officers to not activate their emergency lights or fail to verbally identify themselves), but "bad tactics" do not negate qualified immunity. *Pam*, 154 F.4th at 534 (quoting *Biegert*, 968 F.3d at 698); *see also City & County of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015). Because the officer-created danger exception does not apply, the court turns to whether it was clearly established that a police officer cannot use deadly force under the circumstances Pauer faced.

There is no dispute that an automobile is potentially a deadly weapon. *Tousis*, 84 F.4th at 698. But a vehicle is dangerous only in motion, and therefore in some similar decisions courts have focused on whether it was undisputed that the vehicle was in motion at the time the officer shot. *See, e.g., id.* at 695; *Tolliver*, 820 F.3d at 241-42; *but see Manery*, 124 F.4th at 1077 (holding that officer was entitled to qualified immunity for shooting driver "[w]ithin seconds" of striking the second of two police cars). An implication from these decisions may be that if a vehicle had not yet moved toward her, an officer generally is not entitled to qualified immunity for firing at the driver.

It is undisputed that, by the time Pauer fired, the vehicle was moving forward. (ECF No. 26, ¶¶ 57-58; *see also* Pauer's bodycam.) Within roughly a single second the

engine revved, slowed slightly, revved again, the vehicle began to move forward, and only then did Pauer fire two shots.

What Clark does dispute is whether Pauer was standing "directly" in front of the vehicle. (ECF No. 32, ¶41.) As depicted in the image below, Pauer's bodycam captured the muzzle flash from her first shot.



Clark is correct that Pauer was not "directly" in front of the vehicle in the sense that she was off toward the passenger side rather than positioned at the midpoint of the hood. She had made it roughly to that midpoint after Clark struck the squad car but then started retreating after the engine revved. Insofar as Clark is suggesting that, at the time she fired, Pauer was not in danger from the vehicle accelerating forward, that notion is unsupported by the video evidence and therefore rejected. *See Pam*, 154 F.4th at 529. Pauer was in a position that a reasonable police officer would have objectively feared being run over.

Clark also makes much of the fact that the video depicts that the front wheels of the car were turned to the left, away from Pauer. (ECF Nos. 27 at 5; 32, ¶¶ 31, 39.)

The court of appeals rejected a very similar argument, noting that cars do not move horizontally, but in an arc. *Tousis*, 84 F.4th at 698. Thus, even if directed away from the officer, a car still poses a serious danger to an officer just a few feet in front of it. *Id*. Even if Pauer noticed the tires, she had no way of knowing if Clark would turn back toward her. *See id*. Moreover, the position of the tires is the sort of detail that, while obvious in a retrospective frame-by-frame review of video, is one that an officer in a high-pressure situation is not reasonably expected to recognize in the split-second before using deadly force. *Cf. Manery*, 124 F.4th at 1079 ("We assess the totality of the circumstances 'from the perspective of a reasonable officer on the scene,' not with the benefit of hindsight." (quoting *Muhammed v. City of Chi.*, 316 F.3d 680, 683 (7th Cir. 2002) (internal quotation marks omitted))). In other words, Clark's argument is precisely the sort of second-guessing that qualified immunity exists to protect against. *See al-Kidd*, 563 U.S. at 743 ("Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))).

Clark also argues, "The Seventh Circuit has held that police officers are not entitled to qualified immunity when the facts related to the underlying constitutional violation are disputed." (ECF No. 27 at 7-8 (citing *DuFour-Dowell v. Cogger*, 152 F.3d 678, 680 (7th Cir. 1998); *Omdahl v. Lindholm*, 170 F.3d 730, 734 (7th Cir. 1999); *Gonzalez v. City of Elgin*, 578 F.3d 526, 541 (7th Cir. 2009)).)

This argument appears to largely reflect views that the Supreme Court rejected in *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (rejecting the court of appeal's approach of denying summary judgment on qualified immunity "any time a material issue of fact remains on the excessive force claim") and *Pearson*, 555 U.S. at 236 (holding that it was not mandatory for courts to consider the constitutional question before the question of qualified immunity) Or perhaps Clark is noting that that a court of appeals lacks jurisdiction over an interlocutory appeal of the denial of qualified immunity if the existence of qualified immunity depends on the resolution of disputed material facts. *See Smith v. Whitsel*, 134 F.4th 962, 966 (7th Cir. 2025).

In any event, courts may and routinely do grant summary judgment on qualified immunity grounds when the parties dispute the facts underlying the alleged constitutional violation. At the summary judgment stage, the court merely must view the facts in the light most favorable to the non-movant. Viewing the facts in the light most favorable to the plaintiff, his actions were the result of a cascade of innocent oversights. He did not see the squad car that had stopped behind him. He did not see the police officer standing at the passenger-side window. Nor did he see the police officer standing inches away from him at the driver's side window. He did not see their flashlights illuminating the interior of the car. He did not hear them knocking. He just got in his car, started it, backed up, and had a minor accident. He started to pull forward so he could investigate what he hit, and he did not see the police officer now standing in front of the car. He did not hear her shout. He was not trying to run

over a police officer or even flee; he was just pulling out of a parking space and did not recognize what was going on around him.

While the court accepts Clark's version of the facts, for purposes of summary judgment on the question of qualified immunity the court then views those facts from the perspective of a reasonable police officer in Pauer's position.

Pauer, in the span of nine seconds, confronted a man whom she had reason to believe was extremely dangerous. She learned that he had just been released from prison. Only the day before he had fled the police on a high-speed pursuit. During that pursuit he violently held a woman against her will. He ignored two officers knocking on his window and shining flashlights into his car. Instead, he backed up, striking a squad car in the process. She then found herself in front of the car. The engine raced. She pulled her handgun and pointed her handgun and flashlight at the windshield. The engine raced again, and the car began to move forward toward her. She screamed and fired two shots in quick succession.

Pauer faced an encounter that required her to make split-second decisions in a quickly unfolding and highly stressful situation. *Cf. Manery*, 124 F.4th at 1079. She did not have the luxury of slowing down the encounter, advancing frame-by-frame to discern every detail and then assessing it against a body of legal research to determine the proper course of action. *See Pryor v. Corrigan*, No. 17-cv-1968, 2022 U.S. Dist. LEXIS 91104, *15 (N.D. Ill. May 20, 2022). Even if Clark's subjective intent was innocent, his intent is nonetheless irrelevant. Pauer faced what a reasonable officer in her position would see as an objectively violent threat of death or great

bodily harm. Clark has not identified any case clearly establishing that Pauer's actions violated the Fourth or Fourteenth Amendments. To the contrary, courts have repeatedly held that officers are entitled to qualified immunity under similar circumstances. Pauer, likewise, is entitled to qualified immunity.

**IT IS THEREFORE ORDERED** that Sarah Pauer's motion for summary judgment (ECF No. 15) is **GRANTED**. Pauer is entitled to qualified immunity with respect to the plaintiff's claims. This action is dismissed with prejudice. The Clerk shall enter judgment accordingly.

Dated at Green Bay, Wisconsin this 22nd day of April, 2026.

*s/ Byron B. Conway*
BYRON B. CONWAY
U.S. District Judge